McKEAGUE, J., delivered the lead opinion in which BATCHELDER, J., joined in all but § III.D. BATCHELDER, J. (pp. 948-50), delivered a separate concurring opinion. COLE, C.J. (pp. OSO-SO), delivered a separate dissenting opinion.
OPINION
McKEAGUE, Circuit Judge.
An Ohio jury convicted Genesis Hill of kidnapping and murdering his infant daughter and sentenced him to death. The district court held that the prosecution violated the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by suppressing favorable evidence—a police report and the baby’s mother’s grand jury testimony—and granted a conditional writ of habeas corpus. However, Hill violated a congressionally mandated procedural requisite to ha-beas relief by bringing his Brady claim well beyond AEDPÁ’s one-year statute of limitations period. Because Hill’s Brddy claim is procedurally barred and is otherwise without merit, and because his other grounds for relief are also without merit, we reverse the grant of habeas relief.
I
Factual Background, The Ohio Supreme Court provided a detailed background of the events leading to Hill’s conviction and sentence:
On May 31, 1991, defendant-appellant, Genesis Hill, crept into his girlfriend’s apartment in Cincinnati and surreptitiously removed their six-month-old daughter, Domika Dudley. On June 2, police found Domika’s body, wrapped in trash bags, in a vacant lot behind Hill’s house.-
Hill, age nineteen, and Teresa Dudley, age eighteen, lived near each other and had an on-going relationship. Their daughter, Domika Dudley, was born in November 1990. Around May 29, 1991, Barbara Janson, a neighbor, heard Teresa “making silly little comments” to Hill that she was going to take him to court for child support. Hill replied that “he’d kill that little bitch before he paid anything.” Teresa recalled Hill saying, “I bet I don’t pay,” when she asked him about child support.
On May 31, in the late afternoon, Hill and Teresa were together in Hill’s yard. Teresa became upset, they argued, and Teresa went home. That evening, Teresa went to sleep in her mother’s second-floor apartment in the same room as Domika. Between 11:00 p.m. and midnight, Janson and another neighbor saw Hill enter the front yard of Teresa’s apartment building, but they did not see Hill leave. That front entrance was the only entry way to her apartment except for the back yard, which was enclosed by a high wall. Ten to fifteen minutes after the neighbors saw Hill, Teresa came out and said Domika was missing.
Teresa went to Hill’s home, but was told that Hill was not there and did not have the baby. Hill lived in the same .building as did his uncle and two aunts. Just then, Hill appeared, but he denied knowing where his daughter was. A neighbor *917 hood search for Domika by police proved unsuccessful. Hill appeared unconcerned, did not participate in the search, and was “snickering” and “grinning” as Teresa talked to police about their missing baby.
Around 5:45 a.m., June 1, Teresa and one of Hill’s aunts found a distinctive blue and pink barrette on the floor of Hill’s garage. That barrette was identical to one used in Domika’s hair before she went to sleep.
On the afternoon of June 2, police found a suspicious SMA® baby formula carton in an overgrown vacant lot behind Hill’s garage. That box was not there on the day before when police searched the lot. Domika’s body was inside the carton. A plastic shopping bag and three plastic trash bags had been successively wrapped around her body. Black electrical tape was wrapped around the outer trash bag.
A man’s blue shirt, with white and red stripes, was tied around Domika’s head. Teresa and Jansón identified this shirt as one that “looks like” a shirt Hill owned.
Domika died as a result of three skull fractures, and she had been dead for more than twelve hours. Either a strong, blunt force had struck her head, or her head had been crushed. She might have been injured in a fall, but it seems only if another force had hit her during or after the fall. She was wearing only a diaper and two barrettes.
The baby formula box, in which Domika was found, was similar to one that Hill’s aunt had placed in the trash pile next to Hill’s garage. The box was in the trash on June 1, but not on June 2. Batch numbers on an SMA® can from the aunt’s pantry matched batch numbers on the box in which Domika was found. Hill’s uncle was unable to find the black electrical tape that he kept in a tool box. A forensic expert testified that the last trash bag wrapped around Domika had once been directly attached to a trash bag found’ in Hill’s kitchen. Microscopic grain, crease, and other distinctive marks made in the manufacturing process matched exactly on the two trash bags.
At Teresa’s apartment, police found Hill’s right thumb print on a hallway light bulb near where Teresa and Domi-ka had slept. When Teresa went to sleep that night, the hallway door had been partly open and the light had been on. When she awoke and discovered Domika missing, the light bulb was unscrewed. On the evening of June 2, the day Domi-ka’s body was found, a Cincinnati bus driver overheard a conversation on his bus. One young man, crying and upset, told another, “he could not believe what he had done to a little baby.” The man further stated, “he thought he might get the chair for it.” After the bus driver heard the news about a dead baby, police were called. The bus driver picked Hill out of a photo array as the young man crying on the bus. ¡.
A grand jury indicted Hill on two felony-murder counts in violation of [Ohio Revised Code] 2903.01: murder during an aggravated burglary (Count I) and during a kidnapping (Count II). Each aggravated murder count contained two death-penalty specifications under R.C. 2929.04(A)(7) (murder during an aggravated burglary and murder during a kidnapping). Count III charged aggravated burglary in violation of R.C. 2911,11, and Count IV charged kidnapping in violation of R.C. 2905.01. Hill pled not guilty. At trial, numerous friends and relatives testified for Hill and described his activities on the evening of May 31. Defense *918 witnesses suggested that only two trash bags had been in the kitchen; that Teresa was not a good mother; that she had been aggressive towards Hill on May 31; that she had access to the trash bags in Hill’s kitchen; and that she may have “planted” the barrette on the garage floor.
Hill testified as to his activities on May 31. He admitted he had been in the hallway,, outside Teresa’s door, around 11:00 p.m., and had unscrewed the light bulb. He claimed he only “whistled” to Teresa. When she did not answer, he left and went out the front, the same way he came in. He said he then “[w]ent on about [his] business” (drinking with friends). In his narrative testimony, Hill implicitly denied taking Domika, but he did not explicitly do so. Cross-examination revealed discrepancies between his testimony and his statements to police and two mental health professionals.
The jury found Hill guilty as charged.
State v. Hill, 75 Ohio St.3d 195, 661 N.E.2d 1068, 1072-74 (1996).
During the penalty phase, numerous relatives and friends testified regarding Hill’s character and upbringing and Dr. Nancy Schmidtgoessling testified regarding Hill’s mental health and background. Hill also submitted an unsworn statement, where he said, “I feel hurt. .Growing up was hard. A lot of things wasn’t right for me,” and he “struggled to survive.” Id. at 1074. He was “sorry that you all have to be here,” “sorry that the baby [was] gone,” and “sorry for the family.” Id. He did not admit or deny killing Domika. After hearing the evidence, the jury recommended the death penalty.
Procedural Background. The Ohio Court of Appeals and the Ohio Supreme Court affirmed Hill’s convictions and sentence. State v. Hill, Nos. C-910916, C-940487, 1994 WL 721580, at *15 (Ohio Ct. App. Dec. 21, 1994), aff'd, 75 Ohio St.3d 195, 661 N.E.2d 1068, 1085 (1996), cert. denied, 519 U.S. 895, 117 S.Ct. 241, 136 L.Ed.2d 170 (1996). Hill sought post-conviction relief in state court on various grounds, including alleged unrelated Brady violations, but was unsuccessful. State v. Hill, No. C-100554, 2011 WL 3477183, at *7-8 (Ohio Ct. App. Aug. 10, 2011), perm. app. denied, 132 Ohio St.3d 1513, 974 N.E.2d 112 (2012) (table decision) (third petition); R. 263, Ohio Ct. App. Decision, Page ID 6849, perm. app. denied, 102 Ohio St.3d 1447, 808 N.E.2d 398 (Ohio 2004) (table decision) (second petition); State v. Hill, 90 Ohio St.3d 571, 740 N.E.2d 282, 283 (2001) (denying motion to reopen petition for post-conviction relief); State v. Hill, No. C-961052, 1997 WL 727587, at *2 (Ohio Ct. App. Nov. 21, 1997), perm. app. denied, 81 Ohio St.3d 1468, 690 N.E.2d 1288 (Ohio 1998) (table decision) (first petition).
Hill filed a habeas petition in the district court in June 1998 raising numerous grounds for relief, including a Brady claim alleging that the State suppressed favorable evidence. He filed an amended petition in April 1999, raising a Brady claim alleging that the prosecution “failed to disclose ... exculpatory evidence in its possession which, if disclosed, would have been material to the outcome of [Hill’s] trial.” App. R. 42, Am. Habeas Petition at ¶ 87, J.A. Vol. 2 at 396. Hill then filed a second amended petition in December 2005. R. 137-1, Second Am. Habeas Petition, Page ID 85-103. In that petition, Hill asserted a three-part Brady claim as his fourth ground for relief. Id. at 27-32, ¶¶ 77-97, Page ID 111-16. The district court dismissed -the first two parts of Hill’s Brady claim on the merits. In sub-part (c) (referred to as (Claim 4(c))), Hill made only the sweeping assertion that “[t]he State likely has still more Brady material that it is refusing or unable to produce.” R. *919 137-1, Second Am. Habeas Petition at 31, Page ID 115. Hill did not identify any Brady evidence to support Claim 4(c), leading the district court to dismiss .it because “the utter lack of substance to the claim makes any procedural default analysis not only impossible, but also unnecessary.” Hill v. Mitchell, No. 1:98-CV-452, 2006 WL 2807017, at *63 (S.D. Ohio Sept. 27, 2006).
In December 2007, Hill discovered a suppressed police report from the night Domika went missing. R. 219-3, Jim Silva-nia Deck, Page ID 2296-97 (averring that Silvania obtained report on December 17, 2007 and sent it to Hill’s counsel via overnight mail on December 18, 2007). In March 2011, he moved the district court to reconsider its finding that Claim 4(c) was procedurally defaulted and to find that the report established cause and prejudice to excuse the procedural bar. The district court agreed and granted the motion for reconsideration. Hill v. Mitchell, No. 1:98-cv-452, 2012 WL 995280, at *14 (S.D. Ohio Mar. 23, 2012).
In September 2012, Hill moved the district court to expand the record to include a transcript of Teresa Dudley’s grand jury testimony, also in support of Claim 4(c). R. 237, Motion to Expand at 7-8, Page ID 2573-74. It appears that the State disclosed the testimony in October 2010. Id. at 4, Page ID 2570.
In March 2013, the district court granted habeas relief on Claim 4(c) based on suppression of the police report. Hill v. Mitchell, No. 1:98-cv-452, 2013 WL 1345831 (S.D. Ohio Mar. 29, 2013). The court also granted Hill’s motion to expand the record to include Dudley’s grand jury testimony as further Brady evidence in support of Claim 4(c). The district court denied Hill’s remaining grounds for relief and issued a conditional writ of habeas corpus directing the State to either release Hill or grant him a new trial. The State timely appealed on the Brady claim, and Hill cross-appealed on five issues: sufficiency of the .evidence, ineffective assistance of trial counsel at the penalty phase, ineffective assistance of counsel on direct appeal, the constitutionality of Ohio’s system of proportionality review, and cumulative error.
II
 We review the district court’s decision to grant a petition for a writ of habeas corpus de novo. Harris v. Stovall, 212 F.3d 940, 942 (6th Cir. 2000). Our review of state court decisions is normally governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d). Under AEDPA, we review a state-court merits adjudication only to determine whether it “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law( as determined by the Supreme Court.” Id. To prevail, a ha-beas petitioner must “ ‘show that the state court’s ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.’” Woods v. Donald, — U.S. —, 135 S.Ct. 1372, 1376, 191 L.Ed.2d 464 (2015) (per curiam) (quoting Harrington v. Richter, 562 U.S. 86, 103, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011)).
AEDPA’s deferential standard applies only to claims that have been “adjudicated on the merits in State court proceedings.” Cullen v. Pinholster, 563 U.S. 170, 186, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). If the state courts have not addressed a claim on its merits, “federal habeas review is not subject to the deferential standard that applies under AED-PA” Cone v. Bell, 556 U.S. 449, 472, 129 *920 S.Ct. 1769, 173 L.Ed.2d 701 (2009). “Instead, the claim is reviewed de novo.” Id. (citing Rompilla v. Beard, 545 U.S. 374, 390, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); Wiggins v. Smith, 539 U.S. 510, 534, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)); Regardless of the standard of review, however, we may not review claims at all unless the petitioner satisfies AED-PA’s procedural requirements—including the requirement that a petitioner bring his claims within AEDPA’s one-year statute of limitations period.
III
The district court granted habeas relief on Claim 4(c) for violations of Brady, 373 U.S. 83, 83 S.Ct. 1194. The State argues that the distinct court erred because (1) Hill did not bring his Brady claim within AEDPA’s one-year statute of limitations period; (2) the claim was procedurally defaulted; and (3) the claim fails on the merits. For the reasons that follow, we' agree that Hill’s claim is barred by AEDPA’s statute of limitations.
A. Background
Hill first raised Claim 4(c) in his second amended habeas petition in October 2005. R. 137-1, Second’Am. Habeas Petition at 31, Page ID 115. Claim 4(c), in its original form, did not cite any specific Brady material, making only the sweeping assertion that “[t]he State likely has still more Brady material that it is refusing or unable to produce.” Id. Hill based this vague allegation on other cases in which the Hamilton County Prosecutor’s Office was found to have violated Brady. Id. Hill also asserted that he asked to review the prosecutor’s and investigating officers’ files, but was not allowed to do so. Id. at 32, Page ID 116. On September 27, 2006, the district court dismissed the original Claim 4(c) as procedurally defaulted because “the utter lack of substance ... makes any procedural default analysis not only impossible, but also unnecessary.” Hill v. Mitchell, 2006 WL 2807017, at *63. Hill ultimately discovered Brady evidence, but did not assert his amended Brady claim in a timely fashion.
Police Report. In December 2007, Hill obtained Officer James Givens’ police report through a private investigator’s public record request. R. 219^, Police Rep., Page ID 2298-99. Givens was the first officer on the scene after Teresa Dudley called to report Domika missing. In the report, Givens wrote, “Investigate why the mother ran from police and asked for the police to check the alley behind the house (several times).” R. 219-4, Police Rep. at 1, Page ID 2298. Despite his current argument that this report is a smoking gun entitling him to relief, Hill waited over three years to bring the report to the district court’s attention. In March 2011, Hill moved the court to reconsider its finding that Claim 4(c) was procedurally defaulted, citing the police report as the Brady evidence that was missing from the original catch-all version of Claim 4(c). R. 219, Am. Motion for Reconsideration at 21-28, Page ID 2280-87. The district court was “displeased by[Hill]’s waiting three years to file the instant motion” and found “his reasons explaining the delay wholly wanting.” Hill v. Mitchell, 2012 WL 995280, at *14. The court -explained that, “[u]nder most circumstances, that delay would present an insurmountable . (and self-imposed) hurdle to a request for reconsideration.” Id.
Nevertheless, the district court found “that equitable principles [do not] -require or justify a refusal to consider [Hill]’s-request because the new evidence at issue strikes at the heart of a case that landed [Hill] on death row.” Id. To avoid AED-PA’s one-year limitation period, the court treated Hill’s motion as one to reconsider *921 under Fed. R. Civ. P. 60(b)(2) and granted it. Id. at *3. The court found that even if it alternatively ■ considered Hill’s motion as one to amend -his habeas petition under Fed. R. Civ. P. 15, Hill could still avoid AEDPA’s statute of limitations because his motion related back to the original Claim 4(c). Id. at *10. The district court then granted habeas relief on the basis of the police report. Hill v. Mitchell, 2013 WL 1345831, at *11.
Grand Jury Testimony. In October 2010—before moving the district court to reconsider its ruling that Claim 4(c) was procedurally defaulted—Hill obtained a transcript of Teresa Dudley’s grand jury testimony. R. 237, Motion to Expand at 4, Page ID 2570. For unexplained reasons, Hill did not includé the grand jury testimony in his motion to reconsider Claim 4(c). Instead, he waited another eighteen months, until September 2012, to move the district court to expand the record to include the grand jury testimony. Id. The State did not object, and the district' court granted the motion. Hill v. Mitchell, 2013 WL 1345831, at *13. While the court granted habeas relief on the basis of the police report, it noted that the grand jury testimony-“bolster[ed]” its conclusion that Hill was entitled to relief. Id. at *13.
B. Motion for Reconsideration—Fed. R. Civ. P. 60(b)(2)
The district court granted Hill’s motion as one for reconsideration under Fed. R. Civ. P. 60(b)(2). We review that decision for abuse of discretion. Landrum v. Anderson, 813 F.3d 330, 334 (6th Cir. 2016) (citing Tyler v. Anderson, 749 F.3d 499, 509 (6th Cir. 2014); Frontier Ins. Co. v. Blaty, 454 F.3d 590, 596 (6th Cir. 2006)). The district court ‘“necessarily abuse[s] its discretion if it based its ruling on .an erroneous view of the law.’ ” Highmark Inc. v. Allcare Health Mgmt. Sys., Inc., — U.S. —, 134 S.Ct. 1744, 1748 n.2, 188 L.Ed.2d 829 (2014) (quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384; 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)); see Schenck v. City of Hudson, 114 F.3d 590, 593 (6th Cir. 1997).
Rule 60(b) allows a habeas petitioner to mové the district court to reconsider a'judgment or order “under a limited set of circumstances.” Gonzalez v. Crosby, 545 U.S. 524, 528, 125 S.Ct. 2641, 162 L.Ed.2d 480 (2005). These limited circumstances include “newly discovered evidence,” such as the police report or the grand jury testimony, under Rule 60(b)(2). Id. But the Supreme Court has consistently explained that the Federal Rules of Civil Procedure apply in habeas cases only “to the extent that they are not inconsistent with any statutory provisions or [the habeas] rules.” Mayle v. Felix, 545 U.S. 644, 654, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005) (quoting Habeas Rule 12); see also Gonzalez, 545 U.S. at 531-32, 125 S.Ct. 2641. Because using Rule 60(b)(2) here would directly contravene AEDPA’s one-year statute of limitations, the district court’s decision is “inconsistent with [a] statutory provision” and the court abused its discretion in granting the motion. Mayle, 545 U.S. at 654, 125 S.Ct. 2562.
The district court’s approach is also inconsistent Rule 60(b)’s own internal restrictions that “limit the friction” with AEDPA. Specifically, Rule 60(b) includes a “1-year deadline for asserting three of the most open-ended grounds of relief (excusable neglect, newly discovered evidence, and fraud).” Gonzalez, 545 U.S. at 534-35, 125 S.Ct. 2641 (citing Fed. R. Civ. P. 60(b)(1)-(3)) (emphasis added). If Hill’s motion was indeed a Rule 60(b)(2) motion based on “newly .discovered evidence,” then regardless of AEDPA, Hill was required to make the motion “no more than a year after the entry of the judgment or order or the date *922 of the proceeding.” Fed. R. Civ. P. 60(c)(1) (emphasis added). But Hill made his motion more than three years after he discovered the police report, and more than four years after the district court’s order dismissing Claim 4(c). By characterizing Hill’s motion as one for reconsideration, the district court not only improperly circumvented AEDPA’s time-bar, but also misapplied the very rule used to evade it. Because the district court’s decision was a misapplication of the law, we hold that the court abused its discretion in granting Hill’s motion as a motion to reconsider under Rule 60(b)(2).
C. Motion to Amend—Fed. R. Civ. P. 15
Because Hill cannot use Rule 60(b) to avoid AEDPA’s statute of limitations, he can only prevail if we characterize his motion as one to amend his initial habeas petition under Fed. R. Civ. P. 15. The district court alluded to this alternative, holding that Hill’s motion, even if viewed as a motion to amend, was not time-barred because it relates back to the first catch-all iteration of Claim 4(c). Hill v. Mitchell, 2012 WL 995280, at *10-14. We again review for abuse of discretion. Coe v. Bell, 161 F.3d 320, 341 (6th Cir. 1998).
AEDPA imposes a one-year limitation period on habeas applications under 28 U.S.C. § 2244(d). Fed. R. Civ. P. 15(c)(1) creates an exception: “when a prisoner files an original petition within the one-year deadline, and later presents new claims in an amended petition filed after the deadline passes, the new claims relate back to the date of the original petition if the new claims share a ‘common core of operative facts’ with the original petition.” Cowan v. Stovall, 645 F.3d 815, 818 (6th Cir. 2011) (quoting Mayle, 545 U.S. at 650, 125 S.Ct. 2562); see 28 U.S.C. § 2242 (providing that habeas applications “may be amended ... as provided in the rules of procedure applicable to civil actions”). Rule 15(c)(1) provides that an amendment relates back when it “asserts a claim ... that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]” If a petition raises a new claim that does not relate back, however, AEDPA’s statute of limitations bars consideration of the new claim. Mayle, 545 U.S. at 656-57, 125 S.Ct. 2562.
The contours of the relation-back doctrine have not been fully developed. In Mayle, the Supreme Court rejected the proposition that an amended petition asserting new habeas claims relates back simply because the new claims arise from the same “trial, conviction, or sentence” as the original petition. Id. at 663-64, 125 S.Ct. 2562. The Court noted that “the key words [in Rule 15(c)(1) ] are ‘conduct, transaction, or occurrence,’ ” and that the rule “relaxes, but does not obliterate, the statute of limitations.” Id. at 656, 659, 125 S.Ct. 2562 (citing Rule 15(c)). It then explained that “relation back depends on the existence of a common ‘core of operative facts’ uniting the original and newly asserted claims.” Id. at 659, 125 S.Ct. 2562. The Court concluded that applying relation back for any trial, conviction, or sentence was too broad a rule, as it would allow “virtually any new claim introduced in an amended petition [to] relate back[] for federal habeas claims.” Id. at 657, 125 S.Ct. 2562. Instead, the court held that “[a]n amended habeas petition does not relate back (and thereby escape AEDPA’s one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those in the original pleading.” Id. at 650, 663, 125 S.Ct. 2562 (rejecting an “unconstrained *923 reading” of Rule 15(c)(1)).[1]
The Court also explained that an overly broad relation-back doctrine would contravene Congress’s intent in enacting AEDPA “to advance the finality of criminal convictions.” Id. at 661, 125 S.Ct. 2562 (citing Rhines v. Weber, 544 U.S. 269, 276, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005)). That is, Congress intentionally “adopted a tight time line, a .one-year limitation period,” and “[i]f claims asserted, after the one-year period could be revived simply because they relate to the same trial, conviction, or sentence as a timely filed claim, AEDPA’s limitation period would have slim significance.” Id. at 662, 125 S.Ct. 2562. From Mayle, then, we know that relation back in those circumstances is not appropriate.
Mayle provided additional guideposts for applying the relation-back doctrine, citing two decisions from our sister circuits as examples of proper applications of the relation-back doctrine. Id. at 664 n.7, 125 S.Ct. 2562 (citing Mandacina v. United States, 328 F.3d 995, 1000-01 (8th Cir. 2003); Woodward v. Williams, 263 F.3d 1135, 1142 (10th Cir. 2001)). In Mandacina, the original habeas petition raised a Brady claim alleging that the government failed to disclose exculpatory evidence that would have supported the theory that someone other than the petitioner murdered the victim. 328 F.3d at 1001. Specifically, the original claim alleged:
[T]he Government failed to properly disclose ... any and all information related by Mr. Strada prior ’ to his death in which Mr. Strada implicated any other person in any criminal activity, including any organized crime-related activity. Such information constitutes favorable and exculpatory information in that it established a motive for others besides Movant Mandacina to have killed or conspired to kill Mr. Strada ... [T]here is a strong factual basis to support a defense theory ... that Mr. Strada was killed not because of any statements he may have made regarding Movant Mandaci-na, but instead was killed by others who had a much stronger motive to retaliate against Mr. Strada.
Id. at 1000. Mandacina’s original Brady claim was thus quite specific, in terms of the information alleged to have been suppressed and its materiality to the defense. The original claim did not mention the “Borland Report” by name, but the Eighth Circuit recognized the report of detectives’ interview of Donna Borland, which had been disclosed to defense counsel, as the “strong factual basis” for the defense theory alluded to in the claim. Id. at 998. And while the original Brady claim was based on suppression of “any and all information” relating to criminal activity and persons implicated by Strada who may have had a motive to kill him, the amended Brady claim alleged that the prosecution had failed “to disclose the names of all suspects with strong motives to murder Strada, as well as all facts developed in the investigation of these suspects.” Id. at 1001. In other words, the amended Brady claim was a slightly more specific iteration of the original Brady claim, premised more specifically on the suppression of names of suspects identified. by Borland. And because the amended claim was deemed to “have arisen out of the same set of facts as the original claim[ ],” it was properly deemed to relate back. Id. at 1000 (citing United States v. Craycraft, 167 F.3d 451, 457 (8th Cir. 1999)).[2]
*924 Similarly, in Woodward, the Tenth Circuit “upheld relation back where the original petition challenged the trial court’s admission of recanted statements” and “the amended petition challenged the court’s refusal to allow the defendant to show that the statements had been recanted.” Mayle, 545 U.S. at 664 n.7, 125 S.Ct. 2562 (citing Woodward, 263 F.3d at 1142). The amended claim was thus deemed to relate back because, in the language of Rule 15(c), it clarified or amplified a claim alleged in the original petition. That is, the amended claim, pertaining to and amplifying the trial court’s error in admitting the same recanted statements, arose out of the same set of operative facts as the original claim.
Since Mayle, we have allowed relation back in similar circumstances, such as when a motion to amend under Rule 15(c) expands on the facts supporting a claim in the original petition. See Cowan, 645 F.3d at 819. In Cowan, the original petition alleged a claim for ineffective assistance of counsel because counsel failed to interview witnesses to support the petitioner’s defense that she was not present during the drug transaction that led to her conviction. Id. The motion to amend expanded on that claim, “describing] the witnesses whom [trial counsel] could have interviewed, and how [they] could have shown” that the petitioner was not present. Id. We held that the amendment related back because “[t]he facts recited in the two documents differed not in kind, but in specificity.” Id.
Hill’s case, however, is markedly different from Cowan, Mandacina, and Woodward. Hill’s motion to amend deals with a Brady claim, just like the original Claim 4(c), but the original Claim 4(c) was completely bereft- of specific fact allegations or evidentiary support and was not tied-to any particular theory of relief. Although Hill asserted grounds for suspicion that a Brady violation may have occurred—the Hamilton County Prosecutor’s Office’s, history, of Brady violations—his original Claim 4(c) merely speculated that the State had Brady material, nothing more. The original claim did not identify, even in general terms, the nature of any suppressed information believed to be exculpatory or impeaching or how such suppressed information was material to the defense. A claim that the State was suppressing an unspecified something is much different- from- a claim regarding what, specifically, the State was suppressing and how it would have benefitted Hill at trial had it been disclosed.
The “utter lack of substance” in Hill’s original Brady claim, as the district court put it,, separates this case from Cowan and the examples cited in Mayle. Hill v. Mitchell, 2006 WL 2807017, at *63. In each of those cases, the original claim presented an-actual theory for relief, and the amendments only “set forth certain particulars of that claim.” Cowan, 645 F.3d at 819; see also Mandacina, 328 F.3d at 1001; Woodward, 263 F.3d at 1142 (“This amendment simply ‘clarifies or amplifies a claim or theory in the original’ petition[.]”). Hill’s original Claim 4(c), by contrast, did not even raise a potential claim for relief. *925 Even though Hill asserted that the prosecution was suppressing evidence, the basis for a Brady claim is the evidence that %oas being suppressed—not a - suspicion that something was being suppressed. Hill did not refer to a single piece of Brady evidence in the original, catch-all version of Claim 4(c). His amended Brady claim cannot be deemed to share a “common core of operative facts”. with the original Claim 4(c), as required for relation back, because the original Claim 4(c) alleged no operative facts out of which the amended claim could also be deemed to have arisen. Mayle, 545 U.S. at 650, 125 S.Ct. 2562.
Applying the relation-back doctrine to such a broad, unsupported claim would also create a greater problem: if a catch-all Brady claim, devoid of Brady material or specific factual allegations, were sufficient to justify relation back under Rule 15(c), then habeas petitioners could routinely circumvent AEDPA’s statute of limitations on Brady claims. All a petitioner would need to do is include a catch-all Brady claim in his original petition (with no Brady evidence) and hope that evidence eventually turns up. If evidence did turn up, the petitioner could then file an amended petition at any time, because any subsequent amendment would relate back and skirt AEDPA’s statute of limitations. It would not matter if Hill, or a future petitioner, waited five, ten, or even twenty years to present Brady evidence, even after its discovery. Such a result would eviscerate AEDPA’s statute of limitations for Brady claims and would run directly contrary to Congress’s intent.
We understand the rationale behind the district court’s decision, which was largely based on equitable principles and the fact that the State did suppress evidence. Hill v. Mitchell, 2012 WL 995280, at *13-14. The district court concluded that Claim 4(c) was not a “new” claim because Hill based the original Claim 4(c) on the prosecution’s history of suppressing evidence. Id: at *13'. The district court’s point is well taken; we agree that Hill had a colorable basis to suspect the State had suppressed evidence, and we agree that the State “is hardly in a position to invoke equitable principles.” Id. at *14. We also recognize that Hill could not have included a Brady claim based on the undiscovered police report or grand jury testimony in his original habeas petition.
But that is exactly why Hill had one year from the discovery of the new evidence (under AEDPA or Rule 60(b)) to bring it to the district court’s attention. Our disapproval of the State’s actions does not excuse Hill’s unexplained failure to present the police report for over three years after he discovered it.[3] We do not have the authority to simply ignore AED-PA’s congressionally mandated requirements based on notions of equity.[4] Again, *926 we may apply the Federal Rules of Civil Procedure only “to the extent that they are not inconsistent with any statutory provisions or [the habeas] rules.” Mayle, 545 U.S. at 654, 125 S.Ct. 2562. Hill asks us to do the opposite and use Rule 60(b) or Rule 15(c) to circumvent AEDPA’s one-year limitations period, a request we cannot grant. See Moreland v. Robinson, 813 F.3d 315, 323 (6th Cir. 2016) (“Rule 60(b) motions and [Rule 15(c) ] motions to amend may not be used as vehicles to circumvent the limitations that Congress has placed upon the presentation of claims in a second or successive application for habeas relief.”). We therefore hold that the district court abused its discretion in bypassing AEDPA’s statute of limitations to grant Hill’s motion to amend (or reconsider) his Brady claim.[5] Because the claim is time-barred, the district court’s award of conditional relief on Claim 4(c) must be reversed.
D. Merits of the Brady Claim
Yet, even if we were to hold the Brady claim properly before the court, it should be found wanting on the merits, even on de novo review. See Jalowiec v. Bradshaw, 657 F.3d 293, 305 (6th Cir. 2011) (where the state courts did not address the merits of the claim, the habeas court may review de novo).
To succeed on a Brady claim, a petitioner must establish: (1) the existence of favorable evidence, either exculpatory or impeaching; (2) that the evidence was suppressed; and (3) that the suppression resulted in prejudice. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). There is no question that the State suppressed Officer Givens’ police report and Teresa Dudley’s grand jury testimony, and all agree that these materials could potentially have been favorable to the defense. However, we remain unpersuaded that the nondisclosure of these materials resulted in cognizable prejudice.
To show cognizable prejudice, Hill must establish that the suppressed evidence is material—that “there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” Kyles, 514 U.S. at 433, 115 S.Ct. 1555 (emphasis added). The question is whether “ ‘the favorable evidence could reasonably be taken to put the whole ease in such a different light as to undermine confidence in the verdict.’ ” Strickler, 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles, 514 U.S. at 435, 115 S.Ct. 1555). Speculation about a different outcome is not enough; “ ‘[t]he likelihood of a different result must be substantial, not just conceivable.’ ” LaMar v. Houk, 798 F.3d 405, 416 (6th Cir. 2015) (quoting Harrington v. Richter, 562 U.S. 86, 112, 131 S.Ct. 770, 178 L.Ed.2d 624 *927 (2011)). That is, the likelihood of-a different result must be great enough to undermine confidence in the verdict. Wearry v. Cain, — U.S. —, 136 S.Ct. 1002, 1006, 194 L.Ed.2d 78 (2016) (citing Smith v. Cain, 565 U.S. 73, 132 S.Ct. 627, 630, 181 L.Ed.2d 571 (2012)).
Hill’s Brady claim rests on two items of marginal, speculative significance: (a) ambiguous comments in a preliminary police report; and (b) grand jury testimony given by Teresa Dudley that was not precisely consistent with her trial testimony.
1. Preliminary Police Report
Officer Givens was the first officer to arrive after Dudley called the police to report that Domika was missing, and he prepared the police report the next morning. R. 219-4, Police Rep. at 1, Page ID 2298. One of the questions in the report asked, “Do you believe that this case could be solved with some additional investigative time?” Id. Givens circled “YES” and wrote “[ijnvestigate why the mother ran from police and asked for the police to check the alley behind the house (several times).” Id. The report then asked for additional comments, and Givens wrote:
Received radio call regarding family trouble. When we arrived Mother and Grandmother were lying on ground crying. The mother then told us she thinks the father took the baby. We searched the house and surrounding area. Notified Lieutenant, we then went to father’s house. Gave consent to search. During search found nothing. Notified CIS they responded and had the Mother,. Grandmother, and father come down for Question!.] CIS interviewed the above.
■Id. at 2, Page ID 2299.
At trial, Givens testified that he arrived at Dudley’s house around 12:15 a.m. on the night Domika disappeared and “saw a Teresa Dudley and her mother. They were laying on the ground crying. It was dispatched as family trouble. I got there and asked them what the problem was. And they said—Teresa said her baby was missing.” Trial Tr. Vol. VIII, Givens Testimony at 1038. Givens then testified that -he and another police officer searched the area, including the alley behind Dudley’s house, and found nothing. Id. at 1038-39.
Two items in the police report are said to have potential impeaching value: (1) Givens’ reference to an otherwise unsupported notion that Dudley ran from police; and (2) Givens’ statement that Dudley asked the police to check “the alley behind the house” “several times.” R. 219-4, Police Rep. at 1, Page ID 2298. The district court held that the report was material Brady evidence because it “easts far more suspicion on Teresa Dudley than any evidence at trial did.” R. 226, Dist. Ct. Op. at 9, Page ID 2393. A closer look, however, reveals that the report has much less probative value than the district court surmised.
Dudley Running from Police. The district court inferred from the report that “Dudley fled from police when they first approached her.... [I]nformation that a young mother who frantically called police when her baby went missing actually fled from police when they first approached her constitutes vital, powerful evidence as' to her credibility.” Id. at 10, Page ID 2394 (emphasis added). But this comment in the police report is hardly “evidence” at all; it reflects a question in Givens’ mind. And the inference drawn by the district court is directly contradicted both by the contents of the report itself and by Givens’ trial testimony. The district court’s assumption that Dudley ran when police first approached her is otherwise unsupported in the record. The comment suggests someone told Givens that Dudley “ran from police;” it does not indicate when she may *928 •have run, or who reported her running. Givens, the first officer on the scene, wrote that “[w]hen we arrived [Dudley] and Grandmother were lying on [the] ground crying.” R. 219-4, Police Rep. at 2, Page ID 2299. Givens confirmed this account at .trial, testifying that Dudley and her mother were lying on the ground crying when police first arrived. Trial Tr. Vol. VIII, Givens. Testimony at 1038. If Dudley ran, there is no evidence she did so when the police first approached.
Certainly, Hill’s counsel could have asked Givens about the “ran from police” comment, its source, and whether he did investigate the matter. Counsel also could have asked Dudley whether she actually ran and, if so, why. But the notion that those questions would have yielded answers tending to exculpate Hill or impeach either Givens or Dudley is a matter of sheer speculation. Several witnesses and police officers were with Dudley that night, and not a single one of them testified that she ran from police. The report, at most, suggested only a potential line of questioning that might have led to something impeaching. Standing alone, the “ran from police” comment is not nearly as incriminating of Dudley as the district court suggested and its impeachment value is wholly speculative. That is, the likelihood that inquiry would have led to any evidence favorable to the defense at all is speculative. Even more remote is the likelihood that inquiry would have led to evidence so exculpatory or impeaching as to undermine confidence in the outcome.
Dudley Asking Police to Check the Alley. The second item in the report is the reference to Dudley’s asking police to “check the alley behind the house.” Id. at 1, Page ID 2298. The district court.used this comment to conclude that the report “gives rise to a reasonable suspicion that Dudley had knowledge not only that her baby was dead but also about where the baby’s body was—before the body was found and at a. time when Dudley was purporting to search for her missing daughter”—“givfing] rise to at least 'an inference that Dudley was responsible for the baby’s death.” R. 226, Dist. Ct. Op. at 10, Page ID 2394.
Again, the district court’s sweeping conclusion rests on inferences and assumptions that simply are not reasonably supported in the record. The court pointed out that Domika’s body was found in a formula box in a vacant lot behind Hill’s house, and that the formula box had previously been located in an alley behind Hill’s house. Id. From these facts, the court inferred that Dudley’s reference to the alley behind the house indicates she knew exactly where Domika was, that she knew Domika was dead, and that she was giving the police the location of her body. But the record provides a simple, more likely explanation for Givens’ statement: Dudley was asking the police to search the alley behind her own house, and for good reason.
When Dudley realized Domika was missing, she ran out of her house screaming that Domika was gone. Trial Tr. Vol. VHI, Janson Testimony at 980; Dudley Testimony at 1009. Her friends Barbara Sue Jan-son and Pamela Lewis told her that they had just seen Hill enter her house through the front, but did not see him leave. Trial Tr. Vol VIII, Janson Testimony at 980, Lewis Testimony at 994-95, Dudley Testimony at 1003. The only exit aside from the front door is through an alley behind Dudley’s house. See Trial Tr, Vol. VIII, Janson Testimony at 980, Lewis testimony at 991, Dudley Testimony at 1014-15; see also R. 237-1, Officer Hennekes Grand Jury Testimony at 3-4, 6, Page ID 2583-84, 2586 (“There is an alley that runs in the rear of [Dudley’s house] that is accessible from that address.... You can walk back the *929 side [of the house] and get to the alley without ever coming back out front.”). Dudley thus likely asked the police to check the alley behind her own house because (1) her baby was missing, (2) her friends told her that Hill had just been in her house, and (8) the only way he could have left without being seen was through the alley behind her house.[6]
The actual events of the evening support this explanation, because the police did check the alley behind Dudley’s house. The report itself notes that police “searched the whole [of Dudley’s] house which includes the attic[,] the alley behind' the house[,] and the father’s house.” R. 219-4, Police Rep. at 1, Page ID 2298 (emphasis added). Officer Givens then testified at trial, consistent with the report, that the police searched the alley behind Dudley’s house the night Domika disappeared. Trial Tr. Vol. VIII, Givens Testimony at 1038-39. He added that the police did not search outside Hill’s house that night. Id. at 1044. If, as the district court assumed, Dudley repeatedly asked police to check the alley behind Hill’s house, why didn’t they look there? Because, to use Occam’s razor, Dudley did not ask police to check the alley behind Hill’s house; she asked them to check the alley behind her own.[7] It follows that the potential impeaching value of this comment in the police report is practically nil.- If Hill’s counsel had asked Dudley what she meant, her explanation would likely have been totally innocuous. There is no reason in the record to assume as the district court did.
What we are left with, after excising the district court’s assumptions, is a police report that alludes to two items of ambiguous significance: first, that Dudley might have run from police at some point; and second, that Dudley asked the police to check the alley behind someone’s house for evidence relating to Domika’s disappearance—most likely her own house, because she thought Hill took her baby and left through that alley. Yet, despite the obvious ambiguity of the two items, the district court granted habeas relief without even conducting an evidentiary hearing on the materiality of the police report. In fact, Hill did not even request one.[8] From this, it is hard to avoid the conclusion that Hill’s counsel realized the police report was more significant for its speculative value. That is, counsel likely realized that an evidentiary hearing posed the risk that entirely innocent explanations for both •comments would be exposed; better to let the police report speak for itself and hope that its nondisclosure by the police is deemed to justify an adverse inference. The strategy apparently worked in the district court, but careful scrutiny reveals *930 that Hill has failed to meet his burden of showing materiality. The police report comments simply do not carry the weight the district court assigned to them.
2. Grand Jury Testimony
Dudley’s grand jury testimony is even less helpful to Hill’s case. Before the grand jury, Dudley was asked whether Domika had barrettes in her hair the night she disappeared. She testified:
A. She had three in her hair. She had a pink one on one side with some teddy bears, then she had a pink one with a blue teddy bear, and she had a yellow one at the top.
When we went down there that morning, me, Denise and Ranisha, we went looking up towards my house. And we came back down. They started looking in the garage and I was standing outside the garage. And I looked down. There was a barrette right there ... I was like, there, that is her barrette right there. Ranisha looked up, picked it up and gave it to me.
R. 237-1, Dudley Grand Jury Testimony at 18, Page ID 2598. At trial, Dudley testified:
A. Me, Barbie, and Pam, we went down there, and Ruby was standing outside, and Denise. Then Denise give me a shirt and I set down there. And they say “We help her look for her, if you want me to.” Denise and Ronessa, they had helped me look for her that night.
We had went up in our park, where I live, and we came back down, we started looking in the garages. And I went down and her barrette was right there and I found it. They say “You sure this is your baby barrette?” And I was like, ‘Yeah.”
Q. How many barrettes? How many barrettes was your baby wearing—
A. Three.
Q. —when she went to bed that night?
A. Three.
Q. Do you remember what color they were?
A. Yeah, yellow, and there was a blue one with a pink teddy bear. I forgot the other color, I know it was three barrettes.
Q. Okay. I will show you, you said you found a barrette in the garage at [Hillj’s house that morning?
A. Yeah.
Q. I will show you what’s been marked as State’s Exhibit Number 13, and ask you if you have ever seen this little blue barrette with the pink teddy b[e]ar on it before?
A. Yeah, it was in her hair.
Q. Was it in her hair when she was asleep with you that night?
A. Yeah, because I had did her hair earlier.
Q. And you saw, found that in [Hillj’s garage?
A. Just sitting there.
Trial Tr. Vol. VIII, Dudley Testimony at 1012-14.
Hill points to two inconsistencies between Dudley’s grand jury testimony and her trial testimony: (1) the identity of Dudley’s companions when she searched the garage and found the barrette; and (2) the barrette’s location when Dudley found it. These inconsistencies—to the extent they even exist—are inconsequential and disclosure of the grand jury testimony would have had no impact at Hill’s trial.
Who Searched the Garage? At trial, Dudley testified that Denise (Hill’s aunt) and Ronessa—Denise’s daughter and Hill’s cousin—helped her look for Domika that night. Id. at 1012. Denise and Ronessa confirmed this account at trial, testifying that they were helping Dudley search in *931 the garage when Dudley found the barrette. Trial Tr. Vol. X, Denise Hill Testimony at 1247-49; Ronessa Hill Testimony at 1366-67. Before the grand jury, Dudley testified that Denise and “Ranisha,” rather than “Ronessa,” helped her search the garage. Dudley explained that “Ranisha” is Hill’s cousin, and her last name is Hill. R. 237-1, Dudley Grand Jury Testimony at 19, Page ID 2599.
This “inconsistency”—calling Hill’s cousin “Ranisha” instead of “Ronessa”—again has a simple explanation: Dudley incorrectly called Ronessa by the name “Rani-sha” before the grand jury.[9] There is no person named “Ranisha” involved in this case, and Dudley, Denise, and Ronessa all testified at trial that they were searching the garage when Dudley found the barrette. Trial Tr. Vol. VIII, Dudley Testimony at 1012; Trial Tr. Vol. X, Denise Hill Testimony at 1247-48; Ronessa Hill Testimony at 1373-74. While there may be a nominal discrepancy in the grand jury testimony, there is no substantial reason to believe Dudley identified two different persons.[10]
Whether the Barrette was Inside or Outside the Garage. The second alleged inconsistency is similarly overblown. Before the grand jury, Dudley testified that she was “standing outside the garage” and saw the barrette when she “looked down.” R. 237-1, Dudley Grand Jury Testimony at 18, Page ID 2598. At trial, she testified that she “started looking in the garage[,] [a]nd I went down and her barrette was right there and I found it.” Trial Tr. Vol. VIII, Dudley Testimony at 1012-13. The district court inferred that Dudley’s grand jury testimony indicated she found the barrette outside the garage, while her trial testimony indicated she found it inside the garage. R, 240, Dist. Ct. Op. at 19, Page ID 2685. Hill makes the same argument on appeal.
But Dudley did not testify that she found the barrette outside the garage before the grand jury. She only said that she was standing outside the garage when she saw it. That is not inconsistent with her trial testimony, as she testified that the barrette was “[rjight in the opening” of the garage. Trial Tr. Vol. VIII, Dudley Testimony at 1027. Dudley also'testified before the grand jury that Ronessa (“Ranisha”) was the one who picked up the barrette, and Ronessa was inside the garage. As all of the record evidence indicates the barrette was inside the garage, there is no inconsistency between Dudley’s grand jury testimony and her trial testimony. To the extent the district court imagined or inferred a material discrepancy, again, the appropriate recourse was to conduct an evidentiary hearing. That none was conducted or even requested is telling.
After we again eliminate the unsupported assumptions in the district court’s analysis, the only “inconsistency” in the grand jury testimony is the mix-up with Rones-sa’s .name. This is a minor discrepancy. If *932 it had been disclosed to Hill prior to trial, it would almost certainly have been easily explained .away. There is no reason to believe that Hill would have been able to use it to so effectively impeach Dudley’s credibility as to undermine confidence in the outcome of the trial.
3. Collective Impact
Still, despite the limited probative value of the police report comments and the grand jury testimony, we must “consider the effect of the suppressed evidence collectively, rather than item by item.” Ja-lowiec, 657 F.3d at 305 (citation and internal quotation marks omitted). Collectively, then, we have a police report suggesting Dudley may have run from police at some point and that she told police to check an alley behind someone’s house, and we have grand jury testimony suggesting Dudley was heard to pronounce Hill’s cousin Ronessa’s name differently than she did during Hill’s trial. Hill contends the nondisclosure of these items was prejudicial because he could have used them to undermine the credibility of the prosecution’s most powerful witness, the only person tying Hill to Domika’s murder.
Hill’s argument fails, to account-for. the substantial evidence against Hill from witnesses other than Teresa Dudley. Barbara Janson and Pamela Lewis both testified that they saw Hill enter Dudley’s house, but did not see him leave. Trial Tr. Vol VHÍ, Janson Testimony at 980, Lewis Testimony at 994-95. Hill admitted at trial that he entered Dudley’s home the night Domika disappeared. Trial Tr. Vol. X, Genesis Hill Testimony at 1405-06. Officer Givens testified that Hill lied initially about being in Dudley’s house, denying that he had been there at all the night Domika disappeared. Trial Tr. Vol. VIII, Givens Testimony at 1051. Officers Robert Stein-her and Charles Beaver testified that they found Domika’s body in a vacant lot behind Hill’s house. Id. Steinher Testimony at 1084, Beaver Testimony at 1097-98. Officer Robert Hennekes testified that police found her body in a formula box that was traced back to Hill’s house. Id. Hennekes Testimony at 1065-67. A forensic expert testified that the trash bags wrapped around Domika’s body matched trashed bags from Hill’s home. Trial Tr. Vol. IX, William Dean Testimony at 1170-71. Officer Steinher testified that those trash bags were secured with electrical tape, and that Hill’s uncle was unable to find the electrical tape he normally kept in his tool box. Trial Tr. Vol. VIII, Steinher Testimony at 1088. Finally, a bus driver picked Hill out of a photo array and testified that he saw a passenger matching Hill’s description who said he “could not believe what he had done to a little baby” and feared he would “get the chair for it.” Trial Tr. Vol. IX, Patrick Ormond Testimony at 1138-40.
Now consider the evidence Dudley provided. Yes, she testified that she found the barrette in Hill’s garage, but that is the only evidence for which Dudley is the sole link. Trial Tr. Vol. VIII, Dudley Testimony at 1012-14. Other witnesses independently tied everything else to Hill. Dudley testified that Hill told her “I bet I don’t pay” child support—but Barbara Sue Janson also testified that she overheard a conversation between Hill and Dudley about child support where Hill said he’d “kill that little bitch before, he paid anything.” Id. Janson Testimony at 981-82. Dudley testified that Hill once threw a brick through her window—but Hill also admitted doing so at trial. Compare Trial Tr, Vol. VIII, Dudley Testimony at 1005, with Trial Tr. Vol. X, Hill Testimony at 1415-16. Dudley testified that the lightbulb outside her bedroom was unscrewed right after Domika disappeared—but Hill also admitted unscrewing it. Compare Trial Tr. Vol. VIII, Dudley Testimony at 1008, with Trial Tr. Vol. X, *933 Hill Testimony at 1411. Dudley testified that Hill did not look worried when she told him Domika was missing—but Officer Givens independently testified that Hill was “snickering” and “grinning” at Dudley when the police asked him if-he took the baby. Trial Tr. Vol. VIH, Givens Testimony at 1050-51. Finally, Barbara Sue Jan-son, the State’s first witness, testified that she was “positive” she had seen Hill wear the shirt in which .Domika’s body was found wrapped, or one that “look[ed] just like it.” Trial Tr. Vol. VIII, Janson Testimony at 980-81, 987-88.
Hill also fails to explain how the availability of the police report and the grand jury testimony would have changed anything at Hill’s trial when set against this substantial evidence. Even if we give some limited weight to the suppressed evidence, it would; at most, have been used to marginally impeach the credibility of Teresa Dudley. It would have had no impact on nearly all of the evidence—evidence from witnesses other than Dudley. Speculation about whether Dudley told police to check in an alley does not give rise to such a substantial likelihood of a different result as to “undermine confidence in the jury’s verdict.” Weary, 136 S.Ct. at 1006. Such speculation certainly does not rise to the level of a “reasonable probability that ... the result of the proceeding would have been different.” Kyles, 514 U.S. at 433, 115 S.Ct. 1555, The late-disclosed items are simply not'material.
In summation, Hill brought the suppressed evidence to the district court’s attention well outside AEDPA’s one-year statute of limitations period, and we cannot cast aside AEDPA’s procedural bars using our own considerations of equity. And even if Hill’s Brady claim were properly before the court, it would fail on the merits. On the present record'—absent unsupported assumptions and unfounded speculation— Hill has fallen far short of carrying his burden of showing a reasonable probability that disclosure of the police report or Dudley’s grand jury testimony would have altered the jury’s verdict. Because Brady evidence must be material to warrant relief, and because this evidence is not material, the district court’s award of relief on this claim must be reversed.
IV
Having determined that habeas relief was improperly granted on Hill’s Brady claim, we must now address the five claims of error Hill presents on cross-appeal, challenging the district court’s denial of his other habeas claims. Hill brings claims based on (a) sufficiency of the evidence; (b) ineffective assistance of counsel at the penalty phase; (c) ineffective assistance of counsel on direct appeal; (d) an argument that Ohio’s proportionality review is unconstitutional; and (e) a claim for cumulative error. We find each unpersuasive.
A. Ninth Ground: Sufficiency of the Evidence
Hill first challenges the sufficiency of the evidence supporting his conviction. “[T]he relevant question is whethr er, after viewing the evidence in the light most favorable to the prosecution, any. rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This standard is even more exacting on habeas, as we are reviewing the Ohio Supreme Court’s decision denying Hill’s claim on the merits and must do so through AEDPA’s deferential lens. Under this standard, even if we were to “conclude that a rational trier of fact could not have found the petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appel *934 late court’s sufficiency determination as long as it is not unreasonable.” Brown v. Konteh, 567 F.3d 191, 205 (6th Cir. 2009) (citing 28 U.S.C. § 2254(d)(2)).
Hill’s appeal focuses on the lack of direct evidence implicating him and asserts that the circumstantial evidence was insufficient to support a conviction. However, “[c]ircumstantial evidence may support a conviction, and such evidence need not remove every reasonable hypothesis except that of guilt.” Apanovitch v. Houk, 466 F.3d 460, 488 (6th Cir. 2006) (citations omitted). Hill also attacks the credibility of many witnesses who testified, but we cannot substitute our own determination of guilt in place of the jury’s, and we cannot reweigh the evidence. See Herrera v. Collins, 506 U.S. 390, 401-02, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); Brown, 567 F.3d at 205.
The evidence against Hill was substantial, even if largely circumstantial. Teresa Dudley, Domika’s mother, testified that Hill told her “I bet I don’t pay” child support. Trial Tr. Vol. VTII, Dudley Testimony at 1012-14. Barbara Sue Janson testified that she heard Hill tell Dudley he would “kill that little bitch before he paid anything.” Id. Janson Testimony at 981-82. Two witnesses testified that they saw Hill enter Dudley’s house the night Domi-ka disappeared, but did not see him leave. Trial Tr. Vol. VIII, Janson Testimony at 980, Lewis Testimony at 994-95. Hill admitted at trial that he entered Dudley’s home the night Domika disappeared and unscrewed the lightbulb in the hallway outside her room. Trial Tr. Vol. X, Genesis Hill Testimony at 1405-06. The next morning, Dudley searched Hill’s garage with Hill’s aunt and cousin and found one of the barrettes she placed in Domika’s hair the night before. Trial Tr. Vol. VIII, Dudley Testimony at 1012-14. Officers Robert Ste-inher and Charles Beaver testified that they found Domika’s body in a vacant lot behind Hill’s house. Trial Tr. Volume VIII, Steinher Testimony at 1084, Beaver Testimony at 1097-98. Officer Robert Hennekes testified that the police found Domika’s body in a formula box that was traced back to Hill’s house. Id. Hennekes Testimony at 1065-67. A forensic expert testified that the trash bags wrapped around Domika’s body matched trash bags from Hill’s home. Trial Tr. Vol. IX, William Dean Testimony at 1170-71. Officer Steinher testified that those trash bags were secured with electrical tape, and that Hill’s uncle (who he lived with) was unable to find the electrical tape he normally kept in his tool box. Trial Tr. Vol. VIII, Steinher Testimony at 1088. Dudley and Janson testified that Domika’s body was wrapped in a shirt that “look[ed] just like” one Hill owned. Trial Tr. Vol. VIII, Dudley Testimony at 1005, Janson Testimony at 980-81, 987-88. Finally, a bus driver picked Hill out of a photo array, though at trial the driver clarified he identified Hill based on size and height and “could not really honestly say that it would be him or not.” Trial Tr. Vol. IX, Patrick Ormond Testimony at 1138-41. The driver testified that he saw a passenger matching Hill’s physical description say he “could not believe what he had done to. a little baby” and feared he would “get the chair for .it.” Id. Under the doubly deferential standard of Jackson v. Virginia and AED-PA, this evidence was sufficient for a rational trier of fact to find the essential elements of Hill’s crimes beyond a reasonable doubt. We therefore affirm the district court’s denial of Hill’s challenge to the sufficiency of the evidence.
B. Twelfth Ground: Ineffective Assistance of Trial Counsel—Penalty Phase
Hill next raises a three-part claim for ineffective assistance of trial counsel *935 (IATC) during the penalty phase of his trial. He asserts counsel was constitutionally ineffective for (1) failing to obtain a mitigation expert; (2) failing to hire an independent mental health expert; and (3) failing to adequately prepare lay witnesses (referred to as sub-parts (1), (2), and (3)).
1. Background
Direct Appeal. Following his conviction, Hill raised an IATC on direct appeal based on trial counsel’s alleged failure to object to misconduct by the prosecution. R. 42, Direct Appeal at 46-52, Page ID 4139-45. The Ohio Court of Appeals and the Ohio Supreme Court denied the claim on the merits. Hill, 661 N.E.2d at 1083. Hill did not, however,' bring any claims based on counsel’s alleged failure to hire a mitigation expert (sub-part (1)), failure to hire a mental health expert (sub-part (2)), or failure to adequately prepare witnesses (sub-part©).[11]
First State Post-Conviction Petition. Hill filed his first petition for state post-conviction relief on September 20, 1996, raising a version of sub-parts (1), (2), and (3) for the first time. In that petition’s second claim for relief, Hill argued that trial counsel was ineffective for failing to conduct an adequate search for an expert and failing to obtain an independent mental health expert. R. 47, First State Post-Conviction Petition at ¶¶ 41-60, Page ID 5384-90. He primarily argued that trial counsel was ineffective for relying on court clinic psychologist Dr. Nancy Schmidt-goessling during the mitigation phase. Id. To support these allegations, Hill included two affidavits from attorney “experts” and a transcript of Dr. Schmidtgoessling’s deposition from an unrelated habeas case. R. 47, Affidavits of Steven R. Keller and Ger-aid G. Simmons, Page ID 5470-81; Schmidtgoessling Dep.,. Page ID 5482-5627. Hill also noted that Schmidtgoess-ling’s office did not have mitigation specialists, which he argued would have been “[o]f critical importance” to his case. R. 47, First State Post>-Conviction Petition at ¶ 47, Page ID 5385-86.
In another claim for relief, Hill argued that trial counsel did not conduct an adequate investigation or prepare mitigation witnesses to testify. Id. at ¶¶ 56-57, Page ID 5388-89. To support these allegations, Hill cited the attorneys’ affidavits but also included affidavits from his mother and three aunts. R. 47, Affidavits of Keller and Simmons, Page ID 5470-81; Affidavits of Mary E. Hill, Denise Hill, Jennifer Clark, and Ruby Hill, Page ID 5637-44.
The trial court denied Hill’s petition on the merits without a hearing, finding that Hill’s claims were “unsupported by eviden-tiary documents.” R. 48-2, Trial Ct. Op. at 4-5, 13, Page ID 5981-82, 5990. The Ohio Court of Appeals affirmed on procedural grounds, holding that “[a]ll the ineffective-assistance claims that Hill asserts in his postconviction petition could have been brought on direct appeal.” Hill, 1997 WL 727587, at *1. The Ohio Supreme Court denied discretionary review. State v. Hill, 690 N.E.2d 1288.
Second State Post-Conviction Petition. Hill filed a second state post-conviction petition on February 18, 2000, over three years after his first petition. As his third ground for relief in that petition, he asserted another claim that trial counsel was ineffective for failing to retain an independent mental health expert. R. 262, Second State Post-Conviction Petition at 18-20, Page ID 6458-60. His primary evidentiary *936 support was an affidavit from Dr. Michael Gelbort, who recounted a number of events Hill reported from his upbringing and concluded that Hill had “long-standing” “organic brain impairment” that “would have been in effect at the time of the criminal act in question.” R. 262, Gelbort Aff. at 6, ¶ 26, Page ID 6605.
The trial court denied the petition on procedural grounds because it “d[id] not meet or address the criteria required by [Ohio Revised Code] 2953.23 for a second petition.” R.. 262, Entry Declining to Entertain Second Petition to Vacate, Page ID 6765. The Ohio Court of Appeals affirmed, concluding that section “2953.23(A) precluded the [trial] court from entertaining [Hill’s] tardy and successive petition.” R. 263, Ohio Ct. App. Judgment Entry at 2, Page ID 6849. The Ohio Supreme Court again denied discretionáry review. State v. Hill, 102 Ohio St.3d 1448, 808 N.E.2d 398 (2004).
2. Procedural Default
The district court denied sub-part (1) (failure to hire a mitigation specialist), sub-part (2) (failure to hire an independent mental health expei-t), and part of sub-part (3) (failure to prepare witnesses) as procedurally defaulted. Hill v. Mitchell, 2006 WL 2807017, at *59. We review whether a petitioner’s federal habeas claim is barred by procedural default de novo. Hodges v. Colson, 727 F.3d 517, 530 (6th Cir. 2013).
Ohio’s Procedural Bar—Res Judicata. Ohio has two forms of IATC claims. McGuire v. Warden, 738 F.3d 741, 751 (6th Cir. 2013), cert. denied, McGuire v. Robinson, — U.S. —, 134 S.Ct. 998, 187 L.Ed.2d 847 (2014). Claims' based on evidence wholly within the trial record must be brought on direct appeal, while claims based on evidence outside the trial record cannot be brought on direct review and must be raised in a petition for state post-conviction relief. Id. (citing State v. Cole, 2 Ohio St.3d 112, 443 N.E.2d 169, 171 (1982)). In this dual-track system, res judi-cata bars an IATC claim brought in a state post-conviction petition that relies on evidence within the trial record, because such a claim could have been brought on direct appeal. Id. (citing State v. Perry, 10 Ohio St.2d 175, 226 N.E.2d 104, 108 (1967)). While a claim based on evidence outside the record must be brought in a petition for post-conviction relief, Ohio courts require extra-record evidence to satisfy “some threshold standard of cogency” before allowing the claim to proceed. Wogenstahl v. Mitchell, 668 F.3d 307, 341 (6th Cir. 2012) (quoting State v. Lawson, 103 Ohio App.3d 307, 659 N.E.2d 362, 367 (1995)). Ohio imposes this minimum threshold because otherwise “it would be too easy to defeat the [res judicata bar] by simply attaching as exhibits evidence which is only marginally significant and does not advance the petitioner’s claim beyond, mere hypothesis and a desire for further discovery.” Id.
Hill did not raise the arguments in sub-parts (1), (2), or (3) on direct appeal in state court. When Hill brought them in his first petition for state post-conviction relief, the Ohio Court of Appeals held that they were procedurally barred by res judi-cata because Hill could have brought them on direct appeal. Hill, 1997 WL 727587, at *1. The district court agreed on sub-parts (1) and (2) because Hill’s only extra-record evidence were unpersuasive attorney “expert” affidavits and Dr. Schmidtgoessling’s deposition testimony from ah unrelated case. Hill v. Mitchell, 2006 WL 2807017, at *55-56. As for sub-part (3), the district court found that it could not consider the allegations in Hill’s second post-conviction petition because Hill did not include them in his first petition. Id. at *57. The court then found that some of the allegations of *937 Hill’s first state post-conviction petition relied on evidence outside the trial record and concluded that the Ohio Court of Appeals incorrectly applied res judicata because Hill could not have raised them on direct appeal. Id. (citing Greer v. Mitchell, 264 F.3d 663, 675 (6th Cir. 2001)). .
Neither Hill nor the State contests these findings. Hill argues that we should excuse any procedural default—and so address the merits of his claims—because he can show cause and prejudice on the basis of ineffective assistance of post-conviction counsel under Martinez v. Ryan, 566 U.S. 1, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), and Trevino v. Thaler, — U.S. —, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013).
3. Cause and Prejudice
“There is no constitutional right to an attorney in state post-conviction proceedings.” Coleman v. Thompson, 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Therefore, ineffective assistance of counsel in those proceedings generally cannot serve as a cause for procedural default. Id. In Martinez, however, the Supreme Court carved out a “narrow exception,” holding that “[ijnadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner’s procedural default of a claim of ineffective assistance of counsel at trial,” but only when “state law requires that an ‘ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding.’ ” Trevino, 133 S.Ct. at 1918 (quoting Martinez, 132 S.Ct. at 1315, 1320). The Supreme Court expanded this exception in Trevino, holding that it applied in Texas even though Texas criminal procedure “on its face appears to permit (but does not require) the defendant to raise the claim of [ineffective assistance of trial counsel] on direct appeal.” Id. The Supreme Court concluded “that the Texas procedural system—as a matter of its structure, design, and operation—does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal.” Id. at 1921. Thus, the Trevino Court held that the Martinez exception applied because the petitioner’s first real opportunity to present the claim was in an initial-review collateral proceeding. Id.
Hill argues that Trevino and Martinez apply in Ohio because, like Texas, “Ohio’s procedural framework fails to provide a meaningful opportunity to litigate claims of ineffective assistance of counsel on direct review.” Hill Br. at 71. Hill’s assertion is incorrect on its face and belied by his own case, as he was able' to (and did) raise IATC claims on direct appeal, albeit on different grounds. See R. 42, Direct Appeal at 46-52, Page ID 4139-45. And prior to Trevino, we held that Martinez does not apply in Ohio because Ohio permits (in fact, requires) that defendants bring within-record IATC claims on direct appeal. Moore v. Mitchell, 708 F.3d 760, 785 (6th Cir. 2013). We have yet to decide whether Trevino applies in Ohio, but we have suggested it may not on multiple occasions. See, e.g., Landrum v. Anderson, 813 F.3d 330, 336 (6th Cir. 2016); Henness v. Bagley, 766 F.3d 550, 556-57 (6th Cir. 2014); McGuire, 738 F.3d at 752.
Ohio’s dual-track system for IATC claims complicates matters with respect to Trevino. In McGuire, we noted that “one could argue that the category requiring evidence outside the record must be brought on collateral review in order for review to be meaningful,” suggesting the possibility that the Martinez exception could apply for that category of IATC claims. 738 F.3d at 751-52. But we also explained that, in the “ ‘ordinary’ ” Ohio case, “ ‘ineffective assistance of counsel at *938 mitigation, just like ineffective assistance at trial, is an issue that can be brought on direct appeal.’ ” Id. at 752 (quoting State v. Combs, 100 Ohio App.3d 90, 652 N.E.2d 205, 212 (1994) (collecting Ohio cases)). “Arguably, then, the review of trial counsel ineffectiveness claims in Ohio is more ‘meaningful’ than Texas, because in Ohio there is ‘ordinarily’ the availability of direct review with a constitutionally required counsel, with the back-up of collateral attack where evidence outside the record is required.” Id. We chose not to answer the question in McGuire, as our discussion merely “show[ed] that the application of Trevino to Ohio ineffective-assistance claims is neither obvious nor inevitable.” Id. We have not answered it since. See Williams v. Mitchell, 792 F.3d 606, 615 (6th Cir. 2015). We do not do so today, because even if Trevino applies, Hill cannot satisfy the requirements of the Martinez exception.[12]
4. Ineffective Assistance of Trial Counsel
To establish cause to excuse his procedural default, Hill must satisfy all four requirements of Martinez, as explained in Trevino:
(1) the claim of “ineffective assistance of trial counsel” was. a “substantial” claim;
(2) the “cause” consisted of there being “no counsel” or only “ineffective” counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the “initial” review proceeding in respect to the “ineffective-assistance-of-trial-counsel claim”; and (4) state law requires that an “ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding.”
Trevino, 133 S.Ct. at 1918 (quoting Martinez, 132 S.Ct. at. 1318-21). To excuse his procedural default, then, Hill must show that he has a “substantial” claim of ineffective assistance of trial counsel at the penalty phase. Substantial claims are those that a petitioner shows have “some merit” under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Morrow v. Tennessee, 588 Fed.Appx. 415, 422 (6th Cir. 2014) (quoting Martinez, 132 S.Ct. at 1318-19). Even then, to prevail, Hill must show that trial counsel actually was constitutionally ineffective. He cannot do so.[13]
Because sub-parts (1), (2), and (3)of Hill’s IATC claim were denied based solely on procedural grounds, we review the merits de novo. Barton v. Warden, S. Ohio Correctional Facility, 786 F.3d 450, 459-63 (6th Cir. 2015).[14] “To prevail on a claim of ineffective assistance of counsel, a petitioner must show that counsel’s performance was deficient and that it preju *939 diced him.” McGuire, 738 F.3d at 752 (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052. This standard has two prongs:
First, the defendant must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the “counsel” guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Strickland, 466 U.S. at 687, 104 S.Ct. 2052. With respect to the first prong, our scrutiny of defense counsel’s performance must be “highly deferential.” Id. at 689, 104 S.Ct. 2052. “Because of the' difficulties inherent in making the evaluation, [we] must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.” Id. As for the second prong, a petitioner must demonstrate that there is a reasonable probability that, but for counsel’s errors, the result of the proceedings would have been different. Id. at 694, 104 S.Ct. 2052. However, if we determine that a petitioner has failed to satisfy one prong, we need not consider the other. Id. at 697, 104 S.Ct. 2052. Here, Hill cannot show that his trial counsel’s performance at the penalty phase was deficient.
Under Strickland, “counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.” Id. at 691, 104 S.Ct. 2052. A petitioner may show trial counsel was ineffective for failing to conduct an adequate investigation of a defendant’s family background and méntal health history. See Poindexter v. Mitchell, 454 F.3d 564, 577-78 (6th Cir. 2006) (collecting cases). “Our circuit’s precedent has distinguished between counsel’s complete failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel’s failure to conduct an adequate investigation, where the presumption of reasonable performance is more difficult to overcome.” Beuke v. Houk, 537 F.3d 618, 643 (6th Cir. 2008) (citing Campbell v. Coyle, 260 F.3d 531, 552 (6th Cir. 2001); Moore v. Parker, 425 F.3d 250, 255 (6th Cir. 2005)). A comparison of the mitigation evidence presented with the evidence Hill argues effective counsel would have found demonstrates that counsel did conduct an adequate investigation and that counsel’s performance was not deficient.
(a) Evidence Presented in Mitigation
The district court provided a thorough analysis of the substantial mitigation evidence Hill’s trial counsel presented during the penalty phase of his trial. Hill v. Mitchell, 2013 WL 1345831, at *62-65. Hill’s counsel presented evidence from eight of Hill’s family, members, two friends, Hill’s former juvenile probation officer, Hill himself, and Dr. Schmidtgoess-ling, a psychologist who served as a mental health expert to assist in Hill’s mitigation case. Id. at *62. These witnesses provided a full picture of Hill’s mitigation case, as recounted by the district court:
From [Hillj’s relatives and friends, defense counsel elicited evidence that [Hill] had numerous relatives from both sides of his family with whom he was close-many -of whom expressed disbelief that [Hill] had done what he was accused of; that [Hill] had had some run-ins with the law as a juvenile and grew up in a bad neighborhood rife with gangs and drugs; that [Hill] became involved with drugs to survive and to obtain things he needed; that [Hill] was kind, gentle, and helpful; that [Hill] had a good but some *940 times troubled relationship with his mother, stemming from the fact that she could not always provide for her children, that none of the fathers of her children provided support, and that she suffered severe bouts with depression due to several lost pregnancies; that [Hill] and his father professed to love each other even though they had virtually no relationship and very little contact—a matter that often left [Hill] sad and depressed; that [Hill]’s mother and father never lived together or had a relationship; that [Hill]’s father. had served five years in prison; that [Hill] had struggled in school, particularly in math, despite sometimes demonstrating a desire to finish school and find a job; that [Hill] had spent some time at Hill-crest school for troubled boys; that [Hill] had subsequently spent time at Mill-creek juvenile mental health facility due to suicidal thoughts, a drug overdose, severe depression with psychotic features, and hearing voices that told him to harm himself. The record demonstrates that much óf the information provided by [Hill]’s relatives was pried from them by specific, probing questions by defense counsel—demonstrating counsel’s familiarity with the information those relatives' possessed but were not always prepared to divulge.
From juvenile court social workers, defense counsel presented more detailed evidence about [Hill]’s stay at Hillcrest; the efforts (albeit failed) that [Hill] made to stop abusing • drugs and alcohol and maintain a job; [Hill]’s respectful disposition; the struggles that [Hill]’s brother Marcus also experienced with the law and severe depression; the effect that [Hill]’s noisy, wild, chaotic neighborhood had on [Hill]; the manner in which [Hill] had to align himself with gangs and/or drug dealers for protection; [Hill]’s abuse or at least use of. alcohol and drugs beginning in his teens; [Hill]’s receipt of treatment at the Millcreek juvenile mental health facility due to severe depression, auditory hallucinations,- and suicidal thoughts; and [Hill]’s potential for rehabilitation, to further his education, and to develop vocational skills. [Hill] himself testified in an unsworn statement that growing up was hard and that he struggled to survive; that he had “done things” just to be someone, just to have friends, and just to get clothes; that he had done these things to try to take the pressure off “them” (his parents); that he drank and smoke because he was depressed but that he tried to stop because those things only made him hurt more; that he had wanted to end his life; that he used to hear voices telling him to “go ahead” and kill himself; that he had tried many times to end his life; that at school, he felt considerable pressure from not having the right clothes; that he had had problems especially with-math; that when he went to Millcreek, he had told them all that he wanted help; that his mother’s loss of the baby was bad, that she lived through bad circumstances, but that .she had never left him and had always done the best she could to make sure they had what they needed; that although his father had not been ..around, they knew that they both loved each other;.and that he was sorry the jury had to be there, sorry that the baby was gone, and sorry for the family.
Defense counsel’s final mitigation witness was Dr. Schmidtgoessling. She testified that she had met with [Hill] initially on-September 4, 1991, that subsequently a social worker had met with [Hill] three times, and • that Dr. Schmidtgoessling had then met with [Hill] again on October 25, 26, and 28, 1991. Dr. Schmidtgoessling testified *941 that their collective investigation revealed very much a struggling nuclear family, an extended family that .was protective but struggling itself; a heavy exposure to drug trafficking and use, as well as to violence and intimidation; and a personal ([HillJ’s) and family history of psychological problems. She explained that [Hill]’s mother had had a number -of. serious psychological and emotional losses—stemming from her loss of two pregnancies and her difficult relationships with the fathers of her children—that [HillJ’s mother suffered severe depression from the time that [Hill] was fourteen-years-old; and that [Hill] had as a result many feelings of being overlooked and neglected, and of loss that his mother was not available to him. Dr. Schmidtgoessling further testified that [Hill]’s father was never active in [Hill]’s family, that [Hill] had grown up very much wanting a father, and that [Hill]’s self-worth was damaged by the absence of a relationship with his father. To that point,. Dr. Schmidtgoessling also testified that the man to whom [Hill] was the closest— his maternal grandfather—died when [Hill] was fourteen, at which point [Hill] began experiencing problems, struggling in school, and increasing his substance abuse. By age seventeen, Dr. Schihidtgoessling testified, [Hill] was experiencing problems with serious depression. He was admitted to Millcreek, wheré records described how painful [Hill]’s family situation was for him and where another brother was also hospitalized with serious depression. Dr, Schmidtgoessling proceeded to testify that [Hill] had a large extended family of relatives who tried .to look out for each other but who had problems of their own and were protective and less than forthcoming as a result. As Dr. Schmidtgoessling explained:
... First off as a normal factor, it’s not unusual that some people know [their] families better than others, so they have different perceptions of them.
Our experience here is that some of the family have not been very open about sharing information. One family member would say this was a problem, the other would say'no, it wasn’t. So some of them, we believe, are simply being protective of each other, which is also typical for families. Families ' don’t like to see their family members subjected to what they feel might be painful or humiliating circumstances.
Sometimes families don’t see what’s going on because they’re in denial, they can’t or don’t want to see at a psychological level not deliberately lying, don’t know how to see problems because they don’t know how to solve the problems. We believe that’s also taking place in this family.
Dr. Schmidtgoessling went on to testify about [Hill]’s struggles in school, noting that they had not been able to pinpoint Why [Hill] struggled as he did and remarking that psychologically, school is an important area-where kids determine their selfrworth and is important for developing the skills kids need to succeed later in life. Thus, Dr. Schmidtgoessling explained, [Hill]’s lack of success in school not only held him back in other areas of development but also made him more vulnerable to “street” influences as an alternative place for him to find his “niche.” To that point, Dr. Schmidt-goessling testified about [Hill]’s heavy exposure, from a young age, to drug trafficking and drug use. She explained that, .although they ascertained that [Hill] had begun using drugs and alcohol around age fourteen, they were not able *942 to determine with certainty from their investigation the extent of [Hill]’s use of alcohol and drugs. The neighborhood where [Hill] was raised additionally exposed him to violence, to the point, Dr. Schmidtgoessling explained, that he became habituated to it. Further, according to Dr. Schmidtgoessling, [Hill] was exposed to violence in his own family, with [Hill]’s father having admitted to Dr. Schmidtgoessling that he had been physically abusive toward [Hill]’s mother. All this affected [Hill] as following, according to Dr. Schmidtgoessling:
Basically it caused the defendant to become used to seeing violence. Additionally in his case he became—in an environment like that you’re either a victim of violence or you become aligned with the people, like gangs, to protect himself. And in his case what he did is became more involved with people who were more violent so as to protect himself. We know he’s been doing that since he’s been approximately fourteen or fifteen years old, from what we’ve been able to put together.
The last area of testimony that Dr. Schmidtgoessling covered detailed [Hill]’s history of psychological treatment. Dr. Schmidtgoessling testified about [Hill] receiving treatment at Mill-creek for one month during 1988. Records revealed, according to Dr. Schmidt-goessling, that [Hill] was suffering from major depression with psychotic features, that [Hill] reported hearing voices that told him to harm himself, that [Hill] was treated with antidepressant medication, after which he improved after a month, was released, and was recommended for follow-up treatment at the Central Community Health Board. Dr. Schmidtgoessling was unable to confirm whether [Hill] actually availed himself of that after-care treatment. Dr. Schmidt-goessling reiterated that during the same time period, a brother of [Hill]’s also was hospitalized at University Hospital for depression. Dr. Schmidtgoess-ling proceeded to explain that [Hill], who was twenty years of age, was diagnostically young. Because younger people are “not considered to have a fully crystallized personality or fully set personality,” according to Dr. Schmidtgoessling, “it’s usually—late twenties is when you usually start applying diagnoses that you feel have reliability.” That said, Dr. Schmidtgoessling emphasized that the depression from which [Hill] was suffering was not just “average” depression that everyone may experience; rather, it was much more severe, affecting [Hill]’s functioning in a significant fashion. Dr. Schmidtgoessling also testified that notwithstanding the foregoing, as well as the offenses of which [Hill] was convicted, she was of the view that [Hill] possessed the capacity to develop job skills, to better himself academically, and to benefit from individualized attention that prisons often offer in the way of vocational and educational programs.
In- closing arguments, defense counsel emphasized why [Hill]’s youth was a mitigating factor; all the reasons that [Hill]’s family life and violent surroundings mitigated in favor of a sentence less than death; Dr. Schmidtgoessling’s observations and conclusions; the many positive programs from which [Hill] could benefit in prison; and [Hill]’s sincerity in his unsworn statement.
Hill, 2013 WL 1345831, at *62-65. Based on this evidence, we cannot possibly conclude that trial counsel failed to investigate or present mitigating evidence, and “the presumption of reasonable performance is more difficult to overcome.” Beuke, 537 F.3d at 643 (citing Campbell, 260 F.3d at 552). Accordingly, “we must closely evalu *943 ate whether [Hill’s counsel] exhibited specific deficiencies that were unreasonable under prevailing professional standards.” Id. (citing Dickerson v. Bagley, 453 F.3d 690, 701 (6th Cir. 2006)). Hill cites three alleged deficiencies: failure to present lay witnesses; failure to hire an independent mental health expert; and failure to hire a mitigation specialist.
(b) Failure to Prepare Lay Witnesses
As sub-part (3) of his IATC claim, Hill asserts that trial counsel was ineffective for failing to adequately prepare lay witnesses for their testimony at mitigation. But, as shown above, Hill’s family members testified extensively at his trial and presented a full picture of his upbringing. Hill does not explain why counsel’s actions were deficient, and he cites little additional evidence that counsel should have elicited from witnesses. Hill’s mother and three aunts each submitted affidavits containing the exact same paragraph:
When asked about [Hill] and his childhood, I tried to focus on any positive memories that I had, and I did not understand that all of the difficulties of [Hill]’s upbringing should have been discussed as a potential basis for mitigating circumstances. I did not understand this because nobody ever talked to me about the type of information that is important to bring .out in the mitigation phase of a death penalty trial.
R. 47, Affidavits of Mary E. Hill, Denise Hill, Jennifer Clark, and Ruby Hill, Page ID 5637-44. Despite the lack of evidentiary support, Hill suggests that counsel’s failure to adequately prepare witnesses gave the jury “a severely misleading picture of Hill’s life.” Hill Br. at 68.
Hill’s argument is unpersuasive and does not match the record. Hill’s brief oh appeal cites a number of facts and pieces of information that he alleges counsel should have discovered. He suggests the jury never heard about Hill’s troubled relationship with his father or his mother’s inability to fully care for him and provide the things he needed. Hill Br. at 64-65. He asserts that counsel failed to discover that he attempted suicide, that he abused drugs and alcohol, or that he heard voices telling him to kill himself. Id. But Hill’s counsel did, in fact, present these facts during mitigation. While it is true that Hill’s family presented varying, sometimes-conflicting accounts of Hill’s life and upbringing, “that was not the result of deficient investigation and preparation on the part of defense counsel. Rather, it was the product of reality.” Hill, 2013 WL 1345831, at *68. As Dr. Schmidtgoessling testified, family members are often protective or in denial regarding a family member’s shortcomings, and may be unwilling to discuss them or to even believe that their loved one is capable of committing the crimes for which he was convicted. See Trial Tr. Vol. 12, Schmidtgoessling Testimony at 1713-14; see, e.g., Trial Tr. Yol. 12, Mary Thompson Testimony at 1609-10. But that does not amount to ineffective assistance of trial counsel. What Hill truly argues, as the district court suggested, is that counsel was deficient for “failing to guide family members'into uniformly emphasizing everything negative about [Hill]’s upbringing and uniformly omitting anything positive about [it.]” Hill, 2013 WL 1345831, at *68. We agree with the district court that this argument is not well taken. With regard to the failure to adequately prepare witnesses, Hill cites only one piece of new information: that Hill was born as a result of his father raping his mother. Even if counsel’s performance was deficient for failing to elicit this one fact from Hill’s witnesses, Hill cannot show prejudice. “A petitioner does not establish prejudice if he shows only that his counsel failed to present ‘cumulative’ mitigation evidence, *944 that is, evidence already presented to the jury”. Beuke, 537 F.3d at 645 (quoting Broom v. Mitchell, 441 F.3d 392, 410 (6th Cir. 2006)). The jury heard about the realities of Hill’s upbringing, including that Hill’s father was abusive toward his mother and that that, abuse made Hill accustomed to witnessing violence. While this particular fact is not entirely cumulative, “[it] is not powerful mitigating evidence” that, standing alone, “is reasonably likely to have changed the jury’s recommendation of death.” Beuke, 537 F.3d at 645. Accordingly, Hill cannot show that counsel’s performance was deficient for failing to adequately prepare lay witnesses.
(c) Failure to Hire an Independent Mental Health Specialist
Hill asserts as sub-part (2) of his IATC claim that counsel was constitutionally ineffective for failing to hire an independent and competent mental health expert. Hill argues that Dr. Schmidt-goessling acted, as an agent of the State and that she was wrong in her assessment, of his mental health. Neither argument carries much weight.
Hill cites no authority to support the notion that he was entitled to a particular mental health expert. We have, held that a capital defendant is entitled to a mental health expert during mitigation to assist in preparing an insanity defense, Powell v. Collins, 332 F.3d 376, 392 (6th Cir. 2003). But even if Hill were entitled to an expert, “[t]he Constitution does not require that an indigent criminal defendant be able to retain the expert of his choosing, only that a competent expert be made available.” Lundgren v. Mitchell, 440 F.3d 754, 772 (6th Cir. 2006) (citing Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)).
Hill received the assistance of an expert in Dr. Schmidtgoessling. The trial court granted Hill’s “Motion to Employ Expert” to retain Dr. Schmidtgoessling, a clinical psychologist and the associate director of the Court Psychiatric Center, “to assist counsel in preparing for mitigation for sentencing purposes.” R. 40, Entry Granting Motion, Page ID 3352. Hill asserts this is irrelevant because Dr. Schmidtgoessling worked for the government and was not independent. But the record does not support his assertion, as the court found that Dr. Schmidtgoessling could “maintain a relationship of confidentiality [with Hill] until said privilege is waived by [Hill], subject to the Rules of Discovery.” Id. Dr. Schmidt-goessling testified extensively in mitigation on Hill’s behalf, and absent any evidence to support the idea that she did not maintain confidentiality or testify truthfully to support Hill’s mitigation case, Hill’s argument fails. See Miller v. Colson, 694 F.3d 691, 696 (6th Cir. 2012) (“In psychiatric assistance claims, ‘independent’ has become a term of art referring to a psychiatrist assigned exclusively to assist the accused in his defense.”).
As for Hill’s second argument, trial counsel was not constitutionally ineffective just because Hill disagrees with Dr. Schmidtgoessling’s assessment. “A licensed practitioner is generally held to be competent, unless counsel has good reason to believe to the contrary.” Lundgren, 440 F.3d at 772. And “[a]bsent a showing that trial counsel reasonably believed that [the expert] was somehow incompetent or that additional testing should have occurred, simply introducing the contrary opinion of another mental health expert during habe-as review is not sufficient to demonstrate the ineffectiveness of trial counsel.” McGuire, 738 F.3d at 758 (citing Black v. Bell, 664 F.3d 81, 104-05 (6th Cir. 2011)); see Fautenberry v. Mitchell, 515 F.3d 614, 625-26 (6th Cir. 2008) (concluding, in another case involving Dr. Schmidtgoessling, *945 that in the absence of any evidence that Dr, Schmidtgoessling was incompetent, “any inadequacies in [her] expert .assistance—assuming there were any—cannot be the basis for a. .meritorious ineffective-assistance claim”-). ■ -i
Hill relies heavily on the affidavit of Dr. Gelbort, particularly his statement that “there was evidence of long-standing organic brain impairment, consistent with the fact that Hill had very high levels of lead in his blood during the first year of his life.” Hill Br. at. 6S (citing R. 262, Gelbort Aff., Page ID 6600-06). Nothing in Dr. Schmidtgoessling’s testimony, on the other hand, suggested that Hill had organic.brain impairment. Hill suggests that Dr. Schmidtgoessling incorrectly assessed his mental health, but whether Dr. Schmidt-goessling (at the time of mitigation) or Dr. Gelbort (almost a decade later) was correct is irrelevant. Dr. Schmidtgoessling met with Hill several times, began preparing for mitigation eleven weeks in' advance, and testified extensively on his behalf as a confidential expert. Without evidence that Dr. Schmidtgoessling was incompetent (or that trial counsel knew such a fact); Hill cannot show that trial counsel was deficient for relying on Dr. Schmidtgoessling.
(d) Sub-Part (1): Failure to Hire a Mitigation Specialist,and Investigate
Finally, Hill argues that counsel was deficient for failing to hire a mitigation specialist and failing to conduct an adequate investigation of his background and mental health history. He cites a number of new facts that he claims counsel should have discovered, all from Dr. Gel-bort’s affidavit. As before, however, Hill cites no authority to suggest that counsel was constitutionally required to hire a mitigation specialist beyond Dr. Schmidt-goessling.[15] And the new facts that Hill contends are particularly relevant—that his father’s friends sexually abused him, that his mother beat him regularly, and so on—came from Dr. Gelbort’s conversations with Hill himself. Hill provides no explanation for how his trial counsel could -have discovered these facts unless Hill had told him or Dr. Schmidtgoessling, and Hill never suggests' that he told either of them. Because Hill has not provided any evidence to support his assertion that trial counsel should have discovered these things, counsel’s performance was not deficient simply because Hill waited several years to reveal these facts to Dr. Gelbort.
5. Conclusion
Hill must show a “substantial” claim of ineffective assistance of counsel to excuse the procedural default of his IATC claim, and he must actually demonstrate .that counsel was constitutionally ineffective to prevail on the merits. He has not done so. “Because we find that trial counsel’s performance was not deficient, we need not address whether [Hill] was prejudiced by that performance. [Hill] is not entitled to habeas relief for this claim.” Hodges, 727 F.3d at 646. We therefore affirm the denial of relief on Hill’s IATC claims.
C, Eighteenth & Nineteenth Grounds: Ineffective Assistance of Counsel—Direct Appeal
Hili next argues that he received ineffective assistance of counsel on direct appeal. The district court denied the claim. Hill v. Mitchell, 2013 WL 1345831, at *109.
To demonstrate ineffective assistance of appellate counsel, Hill must satisfy the same requirements prescribed in Strickland for ineffective assistance of trial coun *946 sel. Smith v. Robbins, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).[16] Hill asserts that his counsel on direct appeal was ineffective for: (1) failing to raise a Brady claim regarding the prosecution’s suppression of evidence that Hill told probation officer Lynda Phillips that Domika’s death was an accident; and (2) failing to raise various claims regarding the adequacy of Hill’s trial counsel during the penalty phase.
1. Failure to Raise Brady Claim
During Hill’s sentencing hearing, but after. the jury recommended the death penalty, Phillips testified that Hill told her Do-mika’s death was an accident. App. R. 47, Hill App’x at A-431. Phillips, a juvenile court probation officer, had approached her supervisor before the trial regarding this evidence, but her supervisor told her not to divulge the information. R. 146-3, Phillips Aff., Page ID 486-87. Hill himself had also forbidden,Phillips from testifying because he believed it would make “no difference.” App. R. 47, Phillips Testimony, Hill App’x at A-432. Hill’s appellate counsel did not preserve a Brady claim regarding Phillips’ statement on direct appeal.
Appellate counsel’s failure to raise a Brady claim regarding Phillips’ conversation with Hill was not ineffective assistance of counsel because Hill, not the prosecution, withheld the contents of the conversation. Hill knew what he said to Phillips, and Brady “ ‘only applies to evidence that was known to the prosecution, but unknown to the defense, at the time of trial.’ ” Abdur’Rahman v. Colson, 649 F.3d 468, 474 (6th Cir. 2011) (quoting Apanovitch, 466 F.3d at 474). Hill’s trial counsel was aware of the conversation—and Hill was obviously aware—so the evidence was known to the defense and Brady was inapplicable. See Henness v. Bagley, 644 F.3d 308, 325 (6th Cir. 2011) (“[Petitioner] already knew of his own contact with the police at the time of trial, so the prosecution’s failure to provide this information was not a Brady violation.”). Appellate counsel cannot be ineffective for failing to raise a meritless claim.
2. Failure to Raise Ineffective Assistance of Trial Counsel in Penalty Phase
Hill argues his appellate counsel should have raised claims that trial counsel was ineffective for failing to (a) retain an independent mental health expert; (b) provide necessary records to Dr. Schmidtgoess-ling; (c) object to mitigation phase errors; and (d) request essential jury instructions, including an instruction regarding a “presumption of life.” His arguments are without merit.
Failing to Retain an Independent Mental Health Expert. We have already rejected the merits of the underlying IATC claim for trial counsel’s reliance on Dr. Schmidtgoessling. Hill therefore cannot demonstrate prejudice based on appellate counsel’s failure to raise the claim.
Failing to Provide Records to the Court Psychologist. Hill argues that appellate counsel was ineffective for failing to raise an IATC claim regarding trial counsel’s failure to provide certain records to Dr. Schmidtgoessling. However, as the district court pointed out, and as Hill concedes, this claim “necessarily relies on evidence outside the trial record.” Hill, 2013 WL 1345831, at *100. Under Ohio law, this claim was required to be brought on collateral review. State v. Cole, 443 N.E.2d at 171. Appellate counsel could not have brought this claim on direct appeal and did *947 not perform deficiently -by complying with Ohio law.
Failing to Object to Mitigation Phase Errors. In his appellate brief, Hill simply argues that “[t]rial counsel’s mitigation-phase representation was extremely weak.” Hill Br. at 86. He does not point to any specific errors trial counsel should have objected to during mitigation, nor does he explain how appellate counsel was ineffective for failing to raise an IATC claim on that basis. Hill is not entitled to relief on this undeveloped argument.
Failure to Request Essential Jury Instructions. Hill’s final ineffective-assistance argument is that appellate counsel should have raised an IATC claim because trial counsel failed to request jury instructions regarding a “presumption of life,” the merger of both counts of aggravated murder and the aggravated.circumstances, the lack of unanimity needed to consider mitigating factors, and the additional sentences Hill would haye received to “provide[ ] the jury with an accurate picture of the lengthy sentence Hill faced if a life verdict was returned.” Hill Br. at 85-86.
But “[c]ounsel’s failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue' would have changed the result of the appeal.” McFarland v. Yukins, 356 F.3d 688, 699 (6th Cir. 2004). The jury instructions stated that if the jury did not unanimously find, beyond a reasonable doubt, that the aggravating circumstances outweighed the mitigating factors, it was not to recommend the death penalty. Trial Tr. Vol. XII, Jury Charge at 1783. This instruction is consistent with Ohio Revised Code § 2929.03(D)(2) and it is not unconstitutional. See Buell v. Mitchell, 274 F.3d 337, 355-56 (6th Cir. 2001). Hill does not even attempt to argue that he was prejudiced by trial counsel’s failure to request these jury instructions. He also does not argue that he would have prevailed on appeal if appellate counsel had made this argument. We therefore reject this argument.
3. Conclusion
Because Hill has not shown that appellate counsel’s performance on direct appeal was deficient or that he was prejudiced by counsel’s performance, we affirm the denial of Hill’s ineffective-assistance-of-appellate-counsel claims.
D. Twentieth Ground: Proportionality Review
Hill contends that the Ohio Court of Appeals and the Ohio Supreme Court failed to conduct meaningful proportionality review on direct appeal. He argues that the state courts did not consider “similar cases” because they only compared his case to cases where courts imposed the death penalty. However, the Ohio Supreme Court has held that Ohio’s proportionality review “is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed.” Ohio v. Steffen, 31 Ohio St.3d 111, 509 N.E.2d 383, 395 (1987). Thus, the district court denied the claim. Hill v. Mitchell, 2013 WL 1345831, at *113.
We agree that the state courts did not unreasonably apply clearly established federal law here. The Constitution does not require a trial court to conduct proportionality review following the imposition of a death sentence. Pulley v. Harris, 465 U.S. 37, 50-51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). “Since proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison.” Williams v. Bagtey, 380 F.3d 932, 962 (6th Cir. 2004). We have therefore “held repeatedly that Ohio’s system of proportionality review *948 complies with the dictates of the due process clause,” even when “limiting proportionality review to other cases already decided by the reviewing court in which the death penalty has been imposed.” Id. 962-63 (citing seven prior Sixth Circuit cases that have upheld Ohio’s limited proportionality review against constitutional challenges). Hill cites no authority to convince us to reconsider these decisions, and we therefore affirm the district court’s decision to deny the claim.
E. Twenty-Fourth Ground: Cumulative Error
Finally, Hill argues that the cumulative effect of the errors he alleges deprived him of his right to a fair trial and sentencing. Under AEDPA, we do not recognize claims of cumulative error. Sheppard v. Bagley, 657 F.3d 338, 348 (6th Cir. 2011).
V
Our decision should not be viewed as condoning in any way law enforcement officials’ suppression of information that may have been favorable to Hill’s defense. To the contrary, we reiterate our disapproval of Hamilton County’s consistent history of suppressing evidence.[17] But AED-PA requires habeas petitioners to bring their claims within its one-year limitations period. Hill did not bring the police report to the district court’s attention for over three years, and he did not bring the grand jury testimony forward for almost two years. Hill’s failure to comply with this congressionally mandated procedural bar resulted in “an insurmountable (and self-imposed) hurdle” to habeas relief. Hill v. Mitchell, 2012 WL 995280, at *14. Moreover, as explained above, even if we were to consider the merits of Hill’s Brady claim, he would not be entitled to relief. Hill’s claims on cross-appeal are also without merit. Accordingly, and for the foregoing reasons, we REVERSE the conditional grant of habeas relief on Claim 4(c)..We AFFIRM the denial of habeas relief on the remaining grounds for relief, and REMAND to the district court for entry of an order denying the petition for writ of habe-as corpus.

. Although the Mayle Court referred to Rule 15(c)(2), the relevant language is now contained in Rule 15(c)(1).

. The dissent’s'characterization of Mandacina is markedly different, but erroneous. The dissent accurately quotes language from the opinion describing Mandacina’s original peti *924 tion as containing “only generalized assertions that evidence obtained by the Gladstone Police Department was withheld.” Dissent at 956 (quoting Mandacina, 328 F.3d at 1000) (emphasis- added in dissent). But this language represents the district court's rationale for denying relation back—a ruling the Eighth Circuit reversed precisely because this description of Mandacina’s original claim was not accurate. The Eighth Circuit recognized that Mandacina’s original claim was actually sufficiently specific, as explained above, to both give the government notice and enable the court to determine that the amended claim arose out of the same set of facts as the original. The same cannot be said of Hill's original Brady claim.

. While we have said that "[d]elay by itself is not sufficient reason to deny a motion to amend,” Brooks v. Celeste, 39 F.3d 125, 130 (6th Cir. 1994), we did so before AEDPA was passed and in the context of a lawsuit brought under 42 U.S.C. § 1983—meaning AEDPA’s statute of limitations was not a concern. Our subsequent cases quote this language from Brooks almost exclusively outside the habeas context. While we have quoted it with approval in the habeas context at least once, see Coe, 161 F,3d at 342, the petitioner in Coe filed his habeas petition and his amendments before AEDPA became effective, and thus AEDPA did not apply to the case. As there was no one-year statute of limitations for habeas claims prior to AEDPA, see Lonchar v. Thomas, 517 U.S. 314, 116 S.Ct. 1293, 134 L.Ed.2d 440 (1996), Coe has no bearing here.

. The Supreme Court has held that AEDPA’s statute of limitations is subject to equitable tolling, Holland v. Florida, 560 U.S. 631, 649, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010), but the district court did not invoke equitable tolling and Hill does not argue that it would . apply to his case. Amici mention equitable tolling in passing, see Amici Br. at 24, but the *926 argument is wholly unpersuasive, and "[w]hile an amicus may offer assistance in resolving issues properly before a court, it may not raise additional issues or arguments not raised by the parties.” Cellnet Commc’s, Inc. v. FCC, 149 F.3d 429, 443 (6th Cir. 1998) (internal citations omitted).

. The district court also noted that its original decision dismissing Claim 4(c) was "best characterized as an interlocutory order,” which the court "ha[s] the inherent power-to reconsider.” Hill v. Mitchell, 2012 WL 995280, at *3. Fed. R. Civ. P. 54(b) provides that "any order or other decision ... that adjudicates fewer than all the claims ... may be revised at any time before the entry of a judgment adjudicating all the claims.” As with Rule 60(b) and Rule 15(c), however, courts may not apply Rule 54(b) in a manner inconsistent with AEDPA. Because the court’s prior decision was interlocutory, the court had the prerogative to revisit it, but it still lacked authority to disregard or circumvent AEDPA’s period of limitation.

. Additional evidence in the record supports the conclusion that Dudley was telling police to check behind her own house. The police report itself refers to "the house” numerous times, each instance referring to Dudley’s house. See R. 219-4, Police Rep. at 1, Page ID 2298 (noting that witnesses saw Hill "aroúnd the house" and saw him "enter[] the house”). And when the report refers to Hill’s house, it does so explicitly. See id. (noting that police "searched the house and surrounding afea,” and only “then went to father’s house”).

. "[0]f two competing theories, the simpler explanation ... is to be preferred.” Occam's Razor, Encyclopedia Britannica, http://www. britannica.com/topic/Occams-razor (last visited June 21, 2016); see also Oxford English Dictionary (3d ed. 2004) (defining Occam's razor as “[t]he principle that in explaining anything, no more assumptions should be made than are necessary”).

. Hill requested an evidentiary hearing to show ineffective assistance of counsél, R. 229, Motion at 11-12, Page ID 2427-28, but Hill’s counsel admitted at oral argument that Hill never requested an evidentiary hearing on either the police report or the grand jury testimony.

. Alternatively, the court reporter may have ■ made an aural transcription error. Either way, the discrepancy is immaterial.

. In reasoning to the contrary, the district court made two incorrect assumptions. First, the court assumed that Dudley testified at trial that "Barbie and Pam,” rather than Denise and Ronessa, were with her when she found the barrette. While Dudley testified that "Barbie and Pam” accompanied her to Hill’s ■house, Dudley, Denise, and Ronessa all confirmed that they searched the garage. Second, the court appeared to assume, as Hill now argues, that Dudley testified before the grand jury that "Denise and Ranisha” were her own cousins. R. 240, Dist. Ct. Op. at 19, Page ID 2685. That conclusion is unsupported in the record, as Dudley actually testified before the grand jury that Ranisha (Ronessa) was Hill's cousin, and the only Denise involved in this case is Hill’s aunt. R. 237-1, Dudley Grand Jury Testimony at 19, Page ID 2599,

. Hill’s federal habeas petition had five parts, but sub-parts (4) and (5) are not at issue in (his appeal.

. Both parties' briefing regarding the applicability of Trevino and Martinez in Ohio left much to be desired.

. Our analysis of whether Hill- can show a "substantial” IATC claim- is identical to whether Hill can actually prevail on his IATC claim.

. Although the state trial court denied a version of sub-parts (1), (2), and (3) of Hill’s claim on the merits, our precedent indicates that the decision is not entitled to AEDPA deference. Barton, 786 F.3d at 462. To receive AEDPA deference, the state courts must have "adjudicated [the claim] on the merits.” 28 U.S.C. § 2254(d). To determine whether a state court adjudicated the claim on the merits, "federal courts [are] to Took through’ and defer to the last reasoned state-court opinion' that addressed the matter,” Barton, 786 F.3d at 462. In Barton, we explained that, even if a trial court decides a claim on the merits, that decision is “stripped of any preclusive effect under the last-reasoned decision rule” when the state appellate court affirms the trial court's decision "entirely based on a procedural bar.” Id. at 463: -

. Hill cites the ABA Guidelines, but they do not establish a constitutional right to a mitiga- . tion specialist—in addition to a mental health expert—during the, mitigation phase.

. The parties contest whether AEDPA applies, but the standard of review is ultimately immaterial because Hill’s claims have no merit.

. See, e.g., Bies v. Sheldon, 775 F.3d 386 (6th Cir. 2014); Gumm v. Mitchell, 775 F.3d 345 (6th Cir. 2014); Jamison v. Collins, 291 F.3d 380 (6th Cir. 2002).